**MOLIVAA EPI POYER, TAVAI MOLELI, TIAPULA IMO MAMEA, AMALU T. PULOU, and LALONIUFALEMALAMA S. TAUTU, Plaintiffs,**

v.

**CONGREGATIONAL CHRISTIAN CHURCH in Laulii Village, IAKOPO SEUMALO, and PELEAFAI TAVESI, Defendants.**

High Court of American Samoa
Land and Titles Division

LT No. 04-03

August 2, 2004

Before RICHMOND, Associate Justice, SAGAPOLUTELE, Associate Judge, and TAPOPO, Associate Judge.

Counsel: For Plaintiffs, Tauivi Tuinei
         For Defendants, S. Salanoa Aumoeualogo

## OPINION AND ORDER

On February 26, 2003, Plaintiffs brought this action to cancel the lease between Defendant Peleafei Tavesi ("Peleafei"), on behalf of the Peleafei Family, as lessor, and Defendant Congregational Christian Church in Laulii Village ("CCCAS"), as lessee. Pursuant to A.S.C.A. § 43.0302, on December 2, 2003, the Secretary of Samoa Affairs issued a certificate of irreconcilable dispute, following failed mediation sessions with the parties, which on January 15, 2004, was filed with and gave jurisdiction to the Court to judicially resolve the dispute. The case came to trial on April 27 and 28, 2004. Both counsel were present.

## Discussion

The land included in the lease at issue is the Peleafei family's communal land. The Peleafei titleholder, as the family's *sa`o* ("head"), controls in a trust-like fashion the occupancy and use of the family's communal land. *Lutu v. Taesaliali`i*, 11 A.S.R.2d 80, 88 (Land & Titles Div. 1989). Under the Peleafei titleholder's authority, the London Missionary Society ("LMS") first occupied and used the land for its religious program in the 1800s. Peleafei family members living in Laulii helped to found and for many years worshipped at the LMS church. At some point, however, most family members in Laulii assisted in starting and to this time changed their religious allegiance to the Methodist Church located elsewhere in Laulii. Still, the LMS and its successor CCCAS remained on the land at issue with the Peleafei titleholders' permission.

In the 1990s, the CCCAS resolved to improve the leased land, including adding a new building for religious programs. The proposed improvements contemplated some expansion of the area occupied and used by the CCCAS. The area as expanded was included in the land actually leased. The CCCAS needed a bank loan to fund the construction. As is typical with bank lending for improvements on communal land, the bank required the CCCAS to have a formal leasehold interest in the land to use as mortgage collateral in support of the loan. The CCCAS negotiated lease terms with Peleafei, and they eventually entered the lease at issue on August 1, 1999.

The leased land consists of approximately 1.444 acres. The land is a relatively flat area lying between the main public road and a steeply

rising mountain side. The lease term is 55 years, the maximum allowed by law. A.S.C.A. § 37.0221(a).

The executed lease was submitted to the Territorial Registrar for registration pursuant to A.S.C.A. § 37.0210. Creating a leasehold interest in the land, the Registrar referred the lease to the Land Commission for the Commission's study and recommendations in compliance with A.S.C.A. § 37.0203(a). The Commission noticed and conducted a hearing on the lease on October 11, 1999. Peleafei family members attended the hearing, and apparently several other hearings, to object to the lease. On September 27, 1999, they also filed a written objection, dated September 23, 1999, with the Registrar as the Commission's secretary. The objection cited an earlier agreement among family members not to allow any further CCCAS construction on the land and to limit the CCCAS occupancy and use of the land to the existing structure.

Peleafei did not attend any Land Commission hearing on the lease, but he did submit to the Commission a written statement, dated May 4, 2000, purportedly withdrawing his support of the lease. On May 15, 2000, he also gave Plaintiff Molivaa Epi Poyer, who attended the Commission hearings in opposition to the lease, his power of attorney to act on family communal land matters. The power did not alter Peleafei's ultimate authority over the land. Peleafei exercised that authority on February 15, 2002, when he again advised the Commission in writing that he truly supported the lease and the new CCCAS construction.

When the objecting Peleafei family members learned of Peleafei's final decision, they apparently expected that their disagreement with Peleafei would then be mediated by the Secretary of Samoan Affairs. Instead, as authorized by A.S.C.A. § 37.0203(b), the Land Commission went ahead with its recommendation that the Governor approve the lease. The lease became effective, at least for purposes of A.S.C.A. §§ 37.0203(a), 37.0221(a), and 37.0210(a), when the Governor approved it on November 13, 2002, and the Territorial Registrar registered it on November 15, 2002.

Plaintiffs vigorously maintain that Peleafei did not consult with the family before entering into the lease with the CCCAS. Peleafei adamantly states that he did confer with the family and inform the members of his intentions to execute a lease with the CCCAS and the essential terms of the lease. We find by a preponderance of the evidence that Peleafei discussed the proposed lease with family members before he signed it. Peleafei admitted that he did not actually read the written lease on the day he signed it, but he had previously agreed on the essential terms with representatives of the CCCAS, and the lease accurately reflected those terms.

Later on, Peleafei changed his mind, in deference to the views of family members opposed to the written lease. Plaintiffs' opposition was principally based against any written lease at all and to some extent, it seems, the lengthy 55-year lease period. Plaintiffs also complained that there was not enough family communal land remaining to meet the family needs. Peleafei convincingly refuted that claim by indicating adequate available communal land elsewhere. Moreover, in any event, Plaintiffs plainly did not object to continuing occupancy and use of the land by the CCCAS, so long as the land was not formally leased.

Peleafei passed on his changed position to the Land Commission while it was still considering the recommendation to make on the Governor's approval. In due course, however, Peleafei recognized the existing commitment the lease made to the CCCAS. He then advised the Land Commission to proceed with the lease approval process. The Commission then recommended the Governor's approval.

■ Peleafei did not confer further with the family, particularly those members opposing the lease of the family's communal land, before he made his final decision to go forward with the lease. He was not, however, obligated as the *sa`o* to again consult with the family members. He was only required not to take arbitrary, capricious, or illegal action, or to otherwise abuse his *sa`o*'s discretion. *Gi v. Temu*, 11 A.S.R.2d 137, 141-42 (Land & Titles Div. 1989); *Fairholt v. Aulava*, 1 A.S.R.2d 73, 79 (Land. & Titles Div. 1983). Peleafei chose to implement the lease, knowing full well the contractual obligations he entered with the CCCAS. His action, in this light, cannot in any way be characterized as arbitrary, capricious, or abusive of a *sa`o*'s reasonable discretion. Our opinion or judgment on the issue cannot be substituted for Peleafei's decision. *Id.*

### Conclusion and Order

The written lease signed by Peleafei on behalf of the Peleafei family, as lessor, and the CCCAS, as the lessee, having received the Land Commission's prior recommendation of the Governor's approval and the Governor's approval, and been registered by the Territorial Registrar, is valid and in full force and effect. Plaintiffs' complaint is dismissed, and judgment shall enter in Defendants' favor.

It is so ordered.